# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

CHERYL ANN VALERIO,

                                Plaintiff,

            -v.-                                    5:14-CV-1457
                                                 (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                Defendant.

HOWARD D. OLINSKY, ESQ., Attorney for Plaintiff
HEETANO SHAMSOONDAR, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT and RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Court Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). This case has proceeded in accordance with General Order 18.

## I. PROCEDURAL HISTORY

On September 20, 2011, plaintiff protectively filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning September 8, 2011. (Administrative Transcript ("T") at 12, 124-27, 196). The application was denied initially on May 3, 2012. (T. 56-57). Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on April 5, 2013. (T. 25-55). On June 19, 2013, ALJ F. Patrick Flanagan found plaintiff was not disabled. (T. 12-20). The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on October 2, 2014. (T. 1–6).

## II.    GENERALLY APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the

residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

## B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

At the time of the ALJ hearing, plaintiff was 48 years old. (T. 31). She lived alone with her husband. (*Id*.) Plaintiff was originally injured in 2003 when she lifted a patient while working as a "geriatric care giver." (T. 32, 48). After she left the care giver position, she went back to school and subsequently worked as a medical secretary until September 8, 2011, when, plaintiff was "let go from [her] job because they felt it was too overwhelming for [her]." (T. 32). Plaintiff testified that she had a license to drive, but only drove once a month – "maybe." (*Id*.)

After plaintiff left the secretarial position, she collected unemployment, but by the time of the ALJ hearing, plaintiff's unemployment benefits had ceased. (T. 33). She worked with VESID,[1] but testified that her case was put "on hold" due to concerns that

---

[1] VESID stands for "Vocational and Educational Services for Individuals with Disabilities." Plaintiff testified at the hearing that the organization is now called "Unity House." (T. 33). The court notes that the New York State Education Department website states that VESID is now known as Adult Career and Continuing Education Services     Vocational Rehabilitation ("ACCES-VR").

plaintiff would not be able to obtain any employment. (*Id.*) Plaintiff testified that she had been looking for "alternative work" ever since she stopped working at the secretarial job. (T. 34). Plaintiff stated that she had one interview, but that she was not hired because the employer felt that the medications that plaintiff was taking would "impair [her] judgment." (*Id.*) Plaintiff testified that she was looking for part-time work because she did not believe that she could work full-time. (*Id.*)

Plaintiff stated that she was being treated by Dr. Schaeffer for neck pain and fibromyalgia, which plaintiff states was diagnosed by Dr. Dolorico in 2005.[2] (T. 35). Plaintiff testified that the fibromyalgia was in all her muscles, and that she had chronic pain all the time. (T. 35-36). Plaintiff's pain was exacerbated by lifting and sitting, standing, or walking "too long." (T. 36). Cold weather made plaintiff worse, and it could only be helped with medication. (*Id.*) Plaintiff also testified that Dr. Schaeffer gave her steroid injections. (*Id.*) Plaintiff testified that, on a scale of one to ten, her pain was at level "nine" even during the hearing. (T. 38).

Plaintiff stated that she could only sit for 25 to 30 minutes at a time, and then would need to get up and walk for approximately four to five minutes before sitting

---

www.acces.nysed.gov/vr. The purpose of either organization is to assist individuals who have disabilities to obtain suitable work. *Id.*

[2] Although the administrative transcript cites to a "report" from Joy Dolorico, M.D., "dated 4/17/2012 to 4/16/2010," there is no such report in the record. The document corresponding to the pages cited in the index is a "Health History" completed by plaintiff on April 16, 2010, from "Oswego County Opportunities, Inc. Health Division, and "reviewed" by an individual whose signature is illegible, but who is clearly not Dr. Dolorico. (T. 238-40). Carpal Tunnel Syndrome ("CTS") is not even mentioned in plaintiff's self-completed form as one of her "major illnesses." (T. 238). The ALJ does not mention Dr. Dolorico in his opinion. However, Dr. Mahender Goriganti, M.D., who specializes in elecrodiagnostic medicine, diagnosed plaintiff with bilateral CTS in 2005. (T. 300-313).

back down. (T. 39).  Plaintiff testified that she could stand for approximately 25 to 30 minutes before she would have to take a break. (T. 39).  The pain was worse if plaintiff attempted to bend at the waist, reach above her head, or reach out in front of her to use a keyboard. (T. 40).  She stated that she could use her fingers to count change or button buttons on a sweater.  She first stated that she could probably lift a plate, but not a gallon of milk, and then she testified that she could carry a gallon of milk from the car to the house and put it in the refrigerator. (T. 40-41).

Plaintiff testified that she could do the dishes, but no other housework,[3] and that she only did dishes once a day. (T. 41-42).  However, she was the "primary cook" for the family. (T. 42).  She took care of her own personal needs and liked to garden in the summer. (T. 43-44).  She gardened three times per week for approximately one half hour each time. (T. 44).  Plaintiff testified that she rarely went out of the house in the winter.  She did not attend church, go to movies, or visit friends. (T. 45).  Plaintiff had three sisters, who would occasionally come to visit her. (*Id.*)  Plaintiff testified that she had some trouble sleeping, but took medication to help her sleep. (*Id.*)  She woke up in the middle of the night due to her neck pain, but then slept most of the day. (T. 45-46).

Plaintiff's attorney questioned her about her prior work as a medical secretary. (T. 47-48).  The secretarial position was full-time and performed sitting at a desk unless she had to get up to file something. (T. 47).  No lifting was required, other than files. Plaintiff stated that she would not be able to perform the secretarial job because of the "long sitting periods, answering . . . multiple phone lines, and the writing, 'cause of my

---

[3] Plaintiff stated that she did not mop, vacuum, or sweep because the pulling and pushing motion aggravated her neck and her muscles. (T. 42).  Any laundry she did was "light loads." (*Id.*)

carpal tunnel [syndrome]." (T. 47). Plaintiff stated that she had carpal tunnel syndrome ("CTS") on both sides. (T. 48). Plaintiff's attorney also asked her about the geriatric care giver position, which required significant lifting of patients. (T. 48).

Plaintiff was administered steroid injections and medication for her pain, but Dr. Schaeffer had not suggested any other form of treatment. (T. 49). Although plaintiff does have a driver's license, her husband drove her to the hearing. (*Id.*) Plaintiff stated that she did not think that she could use public transportation because she would not be able to go up and down the stairs and the buses "jiggle." (*Id.*) Her attorney asked what conditions kept plaintiff from working. Plaintiff stated that "besides the . . . neck pain, shoulder pain, and fibromyalgia," her CTS and the pain in her lower back would keep her from working. (T. 49-50).

Plaintiff testified that she ran errands with her husband approximately once or twice per month. (T. 51). When she got back from doing these errands, she would "lay down and rest for a little while." (*Id.*) She only cooked simple meals. (T. 51-52). Although plaintiff was looking for a job, she believed that she could only do part-time work because of her fibromyalgia and her all-over chronic pain. (T. 52). Plaintiff stated that Dr. Schaeffer recommended that plaintiff only lift up to five (5) pounds and that she sit, stand, or walk in thirty (30) minute increments. (*Id.*)

Plaintiff testified that her fibromyalgia has gotten worse since the diagnosis in 2005. (T. 53). Plaintiff states that she was laid off from her secretarial position because the employer thought that the job was "physically" overwhelming for her and that she was not "quick enough." (T. 53-54). Finally, although Dr. Schaeffer prescribed Zoloft

for plaintiff, he never suggested or recommended any professional mental health treatment.

The plaintiff's brief provides a detailed statement of the medical and other evidence of record. (Pl.'s Br. at 2-12) (Dkt. No. 12). Rather than reciting this evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff, and with any exceptions as noted.

## III.  ALJ'S DECISION

After finding that plaintiff met her insured status requirements through December 31, 2016 and that she had not engaged in substantial gainful activity since her alleged onset date of September 8, 2011, the ALJ found that plaintiff had the following severe impairments: Cervical and Lumbar Degenerative Disc Disease and Fibromyalgia. (T. 14). The ALJ also found that plaintiff's "mild" CTS and depression were not severe. (*Id.*) At Step Three, the ALJ found that plaintiff did not have any impairments or combination of impairments that met or equaled the severity of a listed impairment. (T. 15). In doing so, the ALJ considered Listed Impairments under section 1.00 (Musculoskeletal) and section 11.00 (Nurological). (*Id.*) The record did not contain the requisite criteria for the relevant listings. (*Id.*)

At Step Four, the ALJ found that, in an eight-hour work day, plaintiff had the residual functional capacity ("RFC") to sit six hours; stand and/or walk for two hours; lift and/or carry ten pounds; frequently balance and kneel; and occasionally climb, stoop, crouch, and crawl. (*Id.*) Based on this RFC evaluation, the ALJ found that plaintiff could perform the "full range" of sedentary work as defined in 20 C.F.R. §

404.1567(a). (*Id.*)  In making his RFC finding the ALJ considered all plaintiff's symptoms and the extent to which those symptoms could "reasonably be accepted as consistent with the medical evidence and other evidence," based upon the requirements of the regulations. (*Id.*)  The ALJ followed the two-step process to assess plaintiff's credibility and concluded that although her medically determinable impairments could reasonably be expected to cause the alleged symptoms, including pain, the plaintiff's statements as to the intensity, persistence, and limiting effects of those symptoms were not "entirely credible." (T. 16-18).

After determining that plaintiff could perform the full range of sedentary work at Step Four, the ALJ found that plaintiff could perform her previous work as a medical secretary. (T. 19).  In the alternative, the ALJ proceeded to Step Five and determined, based on the Medical-Vocational Guidelines, and considering plaintiff's age, education, and prior work experience, that there were "other jobs that exist in significant numbers in the national economy that claimant also [could] perform." (T. 19-20) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.21).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments:

1.    The ALJ erred in failing to determine that plaintiff's CTS was a severe impairment, and in the alternative, even assuming that the CTS was not severe, the ALJ erred in failing to consider any physical limitations resulting from plaintiff's CTS in the ALJ's RFC determination. (Pl.'s Br. at 13-18) (Dkt. No. 12).

2.    The ALJ failed to properly evaluate the medical evidence in determining plaintiff's RFC. (Pl.'s Br. at 18-22).

3.     The ALJ erred in determining plaintiff's credibility. (Pl.'s Br. at 22-23).

4.     The ALJ's alternative determination at Step Five was not supported by substantial evidence. (Pl.'s Br. at 23-25).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. For the following reasons, this court agrees with the defendant and will recommend dismissal of the complaint.

## VI.  **Severe Impairment**

### A.    **Legal Standards**

The claimant bears the burden of presenting evidence establishing severity at Step Two of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Rep.-Rec.), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011). A severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).

The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a

routine work setting. 20 C.F.R. § 404. 1521(b). "Severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis. The mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10 (W.D.N.Y. Sept. 30, 2013) (quoting *McConnell v. Astrue*, No. 6:03-CV-521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)).

An ALJ should make a finding of "'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'" *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3 (1985)). Although an impairment may not be severe by itself, the ALJ must also consider "the possibility of several such impairments combining to produce a severe impairment . . . ." SSR 85-28, 1985 WL 56856, at *3. However, a combination of "slight abnormalities," having no more a minimal effect on plaintiff's ability to work will not be considered severe. *Id.* The ALJ must assess the impact of the combination of impairments, rather than assessing the contribution of each impairment to the restriction of activity separately, as if each impairment existed alone. *Id.*

The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). If the disability claim rises above a *de minimis* level, then the ALJ must undertake the remaining analysis of the claim at Step Three through Step Five. *Id.* at 1030.

Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone. *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)). This is particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity. 20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

## B.    Application

Plaintiff argues that the ALJ erred in his Step Two determination, and that any error was not harmless. In the ALJ's Step Two determination, he stated that "there [was] also reference to 'mild' [CTS] in the evidence of record, including an EMG/NCV study performed in September of 2005, suggesting mild neuropathy." (T. 14). However, the ALJ stated that plaintiff "did not testify to any disabling [CTS] and did not receive significant treatment for her wrists." (*Id.*) Therefore, the ALJ found that the plaintiff's CTS did not "cause more than minimal limitations in the claimant's ability to perform basic work activities and is a non-severe impairment." (*Id.*)

Plaintiff argues that the ALJ misstated the evidence when he found that the plaintiff did not testify to any disabling CTS and did not receive any significant treatment for her wrists. As the ALJ stated, plaintiff's CTS was first diagnosed in 2005, and plaintiff went back to work as a medical secretary until September of 2011.

Plaintiff "testified" that one of the reasons that she stopped working was her CTS and its affect on her ability to write. However, there is absolutely no medical evidence supporting plaintiff's assertion that the CTS affects her writing ability, and the ALJ found that plaintiff was not fully credible with respect to the intensity of her symptoms.

Plaintiff's CTS has always been categorized as "mild." The latest Electrodiagnostic Report in August of 2012, signed by Dr. Martin Schaeffer, plaintiff's treating physician, noted that plaintiff's CTS was "mild."[4] (T. 335). In 2008, Rheumatologist, Ami Milton, M.D. did not even list CTS as a diagnosis.[5] (T. 235-36). There has been no objective change in plaintiff's CTS since its diagnosis in 2005. On April 27, 2012, consultative physician, Elke Lorensen did not even list CTS as a diagnosis. (T. 280). Dr. Lorensen found that plaintiff's hand and finger dexterity were "intact," and her grip strength was "5/5 bilaterally." (T. 283). There is no question that plaintiff has mild CTS, but as stated above, the mere presence or diagnosis of a disease or impairment is not, by itself, sufficient to deem a condition severe. *Hamilton v. Astrue*, No. 12-CV-6291, 2013 WL 5474210, at *10.

Plaintiff also argues that the ALJ was incorrect when he stated that plaintiff was not getting "significant" treatment for her wrists. (Pl.'s Br. at 17). Plaintiff states that in

---

[4] Dr. Schaeffer's report stated that "Electrodiagnostic testing was consistent with a right median nerve compression in the region of the right carpal tunnel, **mild**, affecting primarily myelin and sensory components. There was no additional electrodiagnostic evidence seen otherwise suggestive of a generalized underlying polyneuropathy, myopathy, or superimposed cervical radiculopathy." (T. 335) (emphasis added).

[5] Plaintiff was working at her secretarial job when she was examined by Dr. Milton. The examination focused on plaintiff's fibromyalgia and general pain issues involving her low back, knees, and ankles. (T. 235).

2005, Dr. Goriganti prescribed Mobic, Effexor, and Ultracet. (*Id.*) (citing T. 307). Plaintiff also points out that after Dr. Schaeffer included CTS as a diagnosis in 2012, he increased plaintiff's "disability rating" under Workers' Compensation from 50% to 75%. (*Id.*) (citing T. 345). The ALJ did not state that plaintiff was not getting "any" treatment for her wrist, merely that she was not getting significant treatment for her wrist.[6] After Dr. Goriganti's diagnosis, the plaintiff went back to work for six years at the job that she alleges she cannot do, in part, because of her wrists. Plaintiff then states that "[i]t also appears that the medication[s] [Dr. Schaeffer] was prescribing for neck and upper extremity pain were used to treat her carpal tunnel syndrome as well." (Pl.'s Br. at 17) (citing T. 345). The doctor did not make such a statement, and counsel is speculating as to what medications were being prescribed for which impairment because the doctor makes no such statement. It is clear that the trigger point injections were not for plaintiff's CTS, and the fact that plaintiff was prescribed medication for her CTS does not make the condition "severe." In addition, Dr. Schaeffer increasing plaintiff's Workers' Compensation disability rating 25% is not relevant to Social Security disability standards. *See Flanagan v. Colvin*, 21 F. Supp. 3d 285, 308 n.27 (S.D.N.Y. 2014) (Workers' Compensation determinations are made under a different standard, relate to plaintiff's prior employment, and are of limited utility for Social Security Disability purposes) (citations omitted).

Plaintiff also argues that any error by the ALJ was not "harmless" because the

---

[6] The court notes that plaintiff was taking Ultracet, Celebrex, Effexor, Skelaxin, Nortiptyline, and Ambien in 2008, when Dr. Milton did not even mention CTS. (T. 235). Thus, plaintiff was already taking these medications for her fibromyalgia and cervical pain issues.

ALJ neglected to consider any effect of CTS in his ultimate RFC determination as required by the regulations. Plaintiff cites *Parker Grose v. Astrue*, 462 F. App'x 16 (2d Cir. 2012), in which the Second Circuit found that the ALJ's error in finding that plaintiff's mental impairment was "non-severe" was not harmless because the ALJ did not take any mental limitations into account when determining plaintiff's RFC. This court does not agree with plaintiff's argument.

In this case, although the ALJ did not specifically state that he was considering the plaintiff's CTS in his finding that plaintiff could perform sedentary work, the ALJ limited plaintiff to lifting only 10 pounds, notwithstanding Dr. Gerald A. Coniglio's determination that plaintiff could lift up to 30 pounds (T. 363). This finding was also consistent with Dr. Mahender Goriganti, who diagnosed CTS in 2005 and limited plaintiff to lifting 10 pounds occasionally. (T. 302). As stated above, plaintiff went back to work after Dr. Goriganti's diagnosis and worked for six more years. In addition, in his RFC discussion, the ALJ specifically mentioned Dr. Lorensen's finding that plaintiff had "no neurologic deficits" and that her "hand and finger dexterity were intact with full grip strength."[7] (T. 18). Dr. Lorensen opined that the plaintiff had a "mild restriction for reaching, pushing, and pulling with the right arm and no other physical restrictions." (T. 18) The ALJ accorded some weight to Dr. Lorensen's opinion. (*Id.*) Thus, it is clear from the ALJ's opinion that, although he did not specifically mention plaintiff's CTS in his RFC evaluation, he considered any possible

---

[7] Plaintiff argues that the RFC evaluation "endorsed by treating physician Dr. Schaeffer, indicated that Plaintiff could not perform any fine hand work with either hand." (Pl.'s Br. at 17). However, the ALJ cited Dr. Lorensen's opinion that plaintiff's hand and finger dexterity were "intact," and that her grip strength was "5/5 bilaterally." (T. 18, 283).

effects of the CTS when he discussed Dr. Lorensen's opinion and when he limited plaintiff to lifting only 10 pounds.

The ALJ also discussed plaintiff's activities, which included gardening "sometimes three days per week for . . . ½ hour at a time . . . ." (T. 18). The ALJ mentioned that plaintiff was laid off from her job, that she went on unemployment thereafter, looking for a secretarial job and working with VESID to find employment. In order to obtain the unemployment benefits, plaintiff had to certify that she was "able to work, available for work, and actively seeking work." (*Id.*) Thus, even if the ALJ erred in determining that plaintiff's CTS was not severe, any error was harmless because the ALJ took all of plaintiff's limitations into account when making his RFC determination.

## VII. <u>RFC/Treating Physician/Weight of the Evidence</u>

### A. **Legal Standards**

#### 1. **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ." A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)).

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, No. 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *7).

### 2. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own

judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

### 3. Weight of the Evidence

In making his determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.* In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

### B. Application

Plaintiff argues that the ALJ's RFC determination is incorrect and argues that the ALJ failed to properly weigh the medical evidence in the record, including evidence from plaintiff's treating sources. Plaintiff's counsel has three bases for his argument. First, plaintiff argues that the ALJ failed to "address" treating physician, Dr.

Schaeffer's "endorsement" of the Functional Capacity Evaluation ("FCE"), conducted by physical therapist Kennett T. Carter from Fitness Forum Physical Therapy & Aquatic Center. Second, plaintiff argues that the ALJ erred in stating that his RFC is supported by Dr. Schaeffer's treatment notes and consultative physician, Dr. Coniglio's examination. Third, plaintiff argues that the ALJ erred in giving "controlling weight" to the state disability medical consultant, Dr. Khuraua, who simply adopted the RFC evaluation of a prior Social Security lay-analyst.

Dr. Schaeffer ordered the FCE at the request of plaintiff's insurance company. After testing plaintiff on November 29, 2012, PT Carter wrote a letter, stating that plaintiff "demonstrates the feasibility to work at the SEDENTARY physical demand level for a 4.0 hour day." (T. 336). PT Carter also stated that although plaintiff "exhibited symptom/disability exaggeration behavior by our criteria," other scores suggested "fair effort and valid results which can be used to assist medical and vocational planning." (*Id.*) PT Carter concluded that the symptom/disability exaggeration classification did not significantly affect the FCE results . . . ." (*Id.*) PT Carter's RFC (FCE) evaluation stated that plaintiff could frequently lift 5 pounds to her shoulder, could occasionally carry 10 pounds with both hands, and could "infrequently"[8] lift up to 15 pounds with both hands, but only 10 pounds with one hand.

The form also listed plaintiff's sitting as "Frequent," her standing ability as

---

[8] The Fitness Forum FCE form does not state the patient's capabilities in terms of "hours." Rather, the work activity is characterized as "Infrequent," "Occasional," "Frequent," and "Constant." (T. 337). At the bottom of the form, Infrequent is defined as 1-3%; Occasional is defined as 3-33%, Frequent is defined as 34-66%; and Constant is defined as 67-100%. The court assumes that the percentages reflect the percent of a work day, although the form itself does not specify.

"Occasional," and her walking ability as "Occasional." (T. 337). Forward reaching was listed as "Frequent," overhead reaching was listed as "Occasional," but critical balancing and fine hand manipulation have "No" written in the space provided. Arm and Leg controls were all listed as "Light" bilaterally. Plaintiff's work classification was listed as "Sedentary," and it was "recommended" that plaintiff be allowed to change positions as needed. (*Id.*)

Dr. Coniglio, an orthopedic surgeon, examined plaintiff on September 17, 2012 and again on November 12, 2012, also at the request of plaintiff's insurance company for purposes of establishing a percentage of disability for Workers' Compensation. (T. 364-74). Dr. Coniglio's November 12, 2012 report is not in the record, but it is discussed extensively by Dr. Coniglio in "clarifying" addenda that he sent to the insurance company on December 20, 2012, February 4, 2013, and March 12, 2013. (T. 355-63). The September 17, 2012 report is in the record, is extensive, and contains a history as stated by plaintiff, a physical examination, and a listing of all of the files and medical reports reviewed by Dr. Coniglio in making his conclusions.[9] The physical examination report is very detailed, with Dr. Coniglio's observations of a substantial number of function and ranges of motion. (T. 372-73). He concluded that there was "no basis for work restrictions "related to the February 3, 2003 claim."[10] (T. 374).

In his December 20, 2012 addendum, Dr. Coniglio stated that he disagreed with

---

[9] Each entry under the heading "File Review" contains the date of the file reviewed and a summary of each file. (T. 369-71).

[10] Dr. Coniglio is referring to plaintiff's Workers' Compensation claim based on her accident while working as a geriatric care giver.

the results of the FCE. He disagreed with the determination that plaintiff could lift only 10 pounds, and with PT Carter's determination that plaintiff's "effort" was "reasonable." (T. 362-63). Dr. Coniglio stated that in his opinion, the plaintiff's effort could not be reasonable because she is depressed. (*Id.*) However, he also stated that "[s]he put forth sub maximal effort during the physical examination with me." (T. 363). Dr. Coniglio believed that plaintiff could lift up to 30 pounds and that her "disability status related to her neck is "mild." (*Id.*)

In Dr. Coniglio's February 4, 2013 addendum, he stated that plaintiff's "current level of disability would be "mild to moderate 33 1/3%," based upon the June 1996 New York State Workers Compensation Impairment Guidelines. . . ." (T. 358). He further stated the "bases of this opinion." (*Id.*) Dr. Coniglio considered plaintiff's pain; the failure of non-surgical treatments to improve her symptoms; the lack of evidence of specific neuromuscular dysfunction; the chronic use of medication to treat her symptoms; the "minor age-related degenerative changes, as well as subjective pain without evidence of focal injury;" and "age-related degenerative changes of the cervical spine." (*Id.*)

On February 5, 2013, Dr. Schaeffer issued a report in response to a request from plaintiff to "address" Dr. Coniglio's December 20, 2012 addendum. (T. 352-53). First, Dr. Schaeffer states his "impression" that plaintiff has neck and upper extremity pain from the 2003 work injury with "mild" carpal tunnel syndrome. (T. 352). Dr. Schaeffer then states that he does not agree with Dr. Coniglio's rejection of the FCE. (*Id.*) Dr. Schaeffer took issue with Dr. Coniglio's assessment that plaintiff was not putting forth

maximal effort because Dr. Coniglio was not present at the FCE and the method used by PT Carter was well-known, accepted, and took into account any issues of effort as discussed by PT Carter in his letter. (T. 352-53). Dr. Schaeffer also disagreed with Dr. Coniglio's statement that plaintiff could lift up to 30 pounds, and agreed with the result of the FCE, finding that plaintiff could lift only 10 pounds. (T. 353). Finally, Dr. Schaeffer stated that he believed the plaintiff was 75% disabled, disagreeing specifically with the "lesser determination from Dr. Coniglio." (*Id.*)

While it is true that the ALJ did not "address" this disagreement between physicians, the reason for his failure to "address" Dr. Schaeffer's "endorsement" of the FCE may be that the ALJ found that his RFC evaluation was "supported by" Dr. Schaeffer's treatment records and Dr. Lorensen's consultative examination. The court notes that the ALJ's determination is supported by substantial evidence. The disagreement between Dr. Schaeffer and Dr. Coniglio was focused on the degree of disability assessed by each doctor, with Dr. Schaeffer finding 75% disability and Dr. Coniglio opining that plaintiff was only 33% disabled. A disagreement as to the percentage of disability under Workers' Compensation standards is not dispositive of the Social Security disability determination because the two standards are different. *Ackley v. Colvin*, No. 13-CV-6656, 2015 WL 1915133, at *5 (W.D.N.Y. April 7, 2015) (citing inter alia *Rosado v. Shalala*, 868 F. Supp. 471, 473 (E.D.N.Y. 1994)).

Dr. Schaeffer and Dr. Coniglio also disagreed about the FCE examiner's determination that plaintiff put forth "reasonable" effort. Although it is not an issue, the court would point out that Dr. Schaeffer's criticism of Dr. Coniglio's findings based

on the fact that he was not "present" at the FCE is misplaced, because Dr. Coniglio also stated that plaintiff put forth sub-maximal effort during **Dr. Coniglio's own** examination. Thus, he believed that plaintiff may also have put forth sub-maximal effort during the FCE. He opinion was based, in part, on his own observation of the plaintiff's effort.

In any event, the ALJ was correct in his determination that the plaintiff's RFC was consistent with Dr. Schaeffer's treatment notes.[11] The ALJ accepted the FCE's determination that plaintiff could only lift up to 10 pounds. One part of the FCE that would prevent plaintiff from performing sedentary work is the conclusion that she could only perform the stated activities for four hours,[12] a conclusion which does not appear in the FCE itself. This conclusion appears in PT Carter's cover letter, submitting the FCE. The basis for this statement is unclear and in fact, appears inconsistent with the FCE itself. The court notes that the FCE states that plaintiff can sit "Frequently," which according to the FCE is between 34-66% of the work day and can stand and walk "Occasionally," which is between 3-33% of the work day. (T. 337). These ranges are quite broad, and other than PT Carter's letter, there are no further specifics regarding the amount of time that plaintiff could perform these functions.

Plaintiff states that Dr. Schaeffer's "records" indicate "disability," and Dr.

---

[11] There is one RFC associated with Dr. Schaeffer's practice. It was completed on December 8, 2011 by Michelle Scott, who is a Nurse Practitioner. (T. 241-42). This RFC is inconsistent even with the FCE by PT Carter, and plaintiff does not press its validity. The court notes that Dr. Schaeffer was subsequently asked to complete an RFC evaluation, but was "unable" to complete it. (T. 231).

[12] Counsel argues that if plaintiff can only work for four hours per day, she is "disabled." (Pl.'s Br. at 19). Even assuming that this statement is true, there is no indication from the FCE that plaintiff is limited to working four hours per day.

Lorensen opines only mild restrictions for reaching, pushing, and pulling with the right arm, with no other physical restrictions. (Pl.'s Br. at 21). Plaintiff argues that this is contrary to the ALJ's finding that his RFC assessment is "supported by the treatment records of [Dr. Schaeffer] and the consultative examination." (*Id.*) (citing (T. 18)). If plaintiff is referring to the FCE, other than the lifting ability and the percentage of disability, Dr. Schaeffer did not discuss any other part, and he never mentioned the four hour restriction on working. The ALJ specifically stated that his RFC was consistent with Dr. Schaeffer's "treatment notes."

A review of Dr. Schaeffer's actual treatment notes confirms the ALJ's finding. On October 31, 2012, Dr. Schaeffer noted that plaintiff had "mild cervical tenderness," and "mild carpal tunnel syndrome," but gross cervical movement appeared to be intact. (T. 347). Handgrip, wrist flexion, elbow flexion were equal and symmetric. Plaintiff had a positive Tinel's Sign,[13] but neurovascular assessment appeared to be intact, and there was no muscle wasting. (*Id.*) Although on December 6, 2012, plaintiff's handgrip, wrist flexion, elbow flexion, and elbow extension were unequal, with the right side weaker than the left, Dr. Schaeffer still referred to plaintiff's carpal tunnel as "mild." (T. 349). There is no question that plaintiff has also been diagnosed with fibromyalgia, but Dr. Schaeffer's notes do not "indicate disability." While Dr. Schaeffer took issue with Dr. Coniglio's opinion on February 5, 2013, as stated above,

---

[13] In a Tinel's sign test, the examiner taps on the inside of the patient's wrist over the median nerve. If the patient feels tingling or numbness in the hand, she may have carpal tunnel syndrome. In a Phalen's sign test — another test used for CTS — the patient holds her arms in front of her and flexes her wrists, letting the hands hang down for about sixty seconds. If the patient feels tingling, numbness or pain in the fingers, she may have carpal tunnel syndrome. http://www.webmd.com/pain-management/carpal- tunnel/physical-exam-for- carpal-tunnel-syndrome

this concern dealt mostly with the lifting requirement and the degree of disability for Workers' Compensation. (T. 362-63). Sedentary is the lowest exertional level; thus, the ALJ accepts that plaintiff has impairments that significantly limit plaintiff's ability to work, but not to the point of being unable to perform substantial gainful activity.

Dr. Lorensen opined that plaintiff would have no limitations other than "mild" restrictions on reaching pushing and pulling with her right arm. (T. 283). Dr. Lorensen specifically stated that "there are no other physical restrictions based on this examination." (*Id.*) Plaintiff argues that "this is obviously contrary" to the finding of sedentary work in the RFC. (Pl.'s Br. at 21). Plaintiff also states that because the ALJ failed to include Dr. Lorensen's restriction on pushing and pulling in his RFC, he "entirely rejected the consultative examiner's opinion."

The ALJ's failure to include every restriction (or lack of restriction) listed in Dr. Lorensen's report does not make his reliance on Dr. Lorensen's report incorrect and does not indicate that he rejected the report. Dr. Lorensen found that plaintiff's only physical restriction was a mild restriction on her ability to push and pull with her right hand. Such a restriction would not prevent plaintiff from performing sedentary work.[14]

Although an "ALJ cannot arbitrarily substitute his own judgment for a competent

_____

[14] The Social Security regulations state that if a person can perform a higher exertional level of work, they are presumed to be able to perform all the lower exertional levels unless there is some additional restriction that would prevent it. See e.g. 20 C.F.R. § 404.1567(b), (c), (d), (e) ("if someone can do light, medium, heavy, or very heavy work, the Commissioner determines that the claimant can do all the exertional levels below, unless there are additional limiting factors); Butler v. Colvin, No. 14-CV-2325, 2015 WL 3606278, at *21 (S.D.N.Y. June 8, 2015) (citations omitted) (same); Cortes v. Colvin, No. 13 Civ. 9098, 2015 WL 2166111, at *14 (S.D.N.Y. May 11, 2015) (same).

medical opinion,"[15] there is no requirement that the ALJ pick one RFC and use that particular evaluation in its entirety. *See Matta v. Astrue*, 508 F. App'x. 53, 56 (2d Cir. 2013) (although ALJ's conclusion did not perfectly correspond with any of the opinions of medical sources, ALJ was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole). There is no requirement that the ALJ accept every limitation in the opinion of a consultative examiner. *See Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013) (ALJ properly declined to credit certain conclusions in CE's opinion that were inconsistent with other evidence of record); *Cruz v. Colvin*, 2014 WL 4826684, *14 (N.D.N.Y. Sept. 29, 2014) (ALJ may credit some portion of a consultative opinion, while properly declining to credit those conclusions that are not supported by CE's own examination findings and inconsistent with other evidence of record).

Finally, the plaintiff faults the ALJ for relying on Dr. Khurana's acceptance of the RFC of "some" lay person. The RFC in question essentially provides for the performance of sedentary work. (T. 58-63, 291). Thus, it is consistent with the ALJ's finding and the other examining physicians upon which the ALJ relied. In this case, while it is clear that there is conflicting evidence, it is the province of the ALJ to resolve such conflicts, particularly when two doctors disagree about plaintiff's condition and specifically analyze evidence in question in justifying their opinions. The ALJ's acceptance of some, but not all of a particular RFC is supported by substantial evidence because the RFC is consistent with the medical evidence of record.

---

[15] *Rosa v. Callahan,* 168 F.3d at 79 (citing *McBrayer v. Sec'y of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir.1983)).

## VIII. Credibility

### A. Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 416.929; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. § 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to function. 20 C.F.R. § 416.929(c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating

and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. § 416.929(c)(3).

## B. Application

The ALJ found that, although plaintiff's impairments could reasonably be expected to cause "the alleged symptoms," her statements regarding the intensity, persistence, and limiting effects of those symptoms were not "entirely credible." (T. 18). The ALJ based his opinion upon plaintiff's performance of a "wide range of activities of daily living," including cooking, shopping, laundry, and some gardening. (*Id.*) The ALJ also noted that plaintiff's original accident occurred in 2003, but she resumed working from 2005 until 2011 as a medical secretary until she was "laid off," and then collected unemployment benefits which required her to certify that she was still able and ready to work. (T. 18). She actively looked for secretarial work, and she told her treating physician that VESID wished to place her at an answering service. (*Id.*)

Plaintiff argues that the ALJ mischaracterized the evidence in making his credibility determination. (Pl.'s Br. at 22-23). Plaintiff states that although she does light housekeeping, she does not mop, vacuum, or sweep because the pulling and pushing of the vacuum cleaner are difficult for her. Plaintiff also argues that she testified that there were days that she did not get out of bed to take care of her personal needs. (*Id.*) However, her testimony was that there were days that she did not "want" to

get out of bed. (T. 43).  She also testified that she planted three days per week, even though she planted perennials which did not require much work. (T. 43-44).

The court notes that although plaintiff "testified" that she only drove once per month and that her husband went grocery shopping with her, she completed a form in her Social Security application process, stating that she was able to do the dishes, do laundry, make beds, and plant flowers, even though she no longer mowed the lawn, raked, or shoveled snow. (T. 207).  Plaintiff also testified that she was the "primary cook for the family." (T. 42).  She checked boxes on the form indicating that when she went out, she walked, drove, and rode in a car. (T. 207).  Plaintiff also told Dr. Lorensen that she "routinely drives herself around with no difficulty." (T. 280). She testified that she could do "light" laundry. (T. 42).  Plaintiff's inability to mow the lawn, mop, shovel snow, or do heavier housework is not inconsistent with an ability to perform sedentary work.

Plaintiff is correct in stating that one does not have to be "an invalid" to be found disabled. (Pl.'s Br. at 23) (citing *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998)). However, the fact that plaintiff may have limitations on her ability to perform certain activities does not automatically entitle her to benefits since the ALJ has found that plaintiff may only perform the least strenuous of the exertional levels of work.  Such a finding presupposes that plaintiff cannot perform a wide variety of functions.

Contrary to plaintiff's assertion, the ALJ is entitled to consider the fact that plaintiff was actively looking for work during the time that she claims to have been disabled. *See Ruffino v. Colvin*, No. 13-CV-800A, 2015 WL 9582704, at *8 (W.D.N.Y.

Oct. 30, 2015) (Rep.-Rec.) (citing *Jackson v. Astrue*, No. 1:05-CV-1061, 2009 WL
3764221, at *8 (N.D.N.Y. Nov. 10, 2009) (discussing cases) (citations omitted)),
*adopted* 2015 WL 9581786 (W.D.N.Y. Dec. 30, 2015).  The court notes that plaintiff's
receipt of unemployment benefits was ***only one factor*** in his credibility analysis.  His
assessment of plaintiff's credibility was thus supported by substantial evidence based
on plaintiff's conflicting statements, her ability to perform the activities associated with
sedentary work, and her receipt of unemployment benefits during much of the time that
she alleged disability.

## IX.   ALJ's Steps Four and Five Determination

### A.   Legal Standards

Once the plaintiff shows that she cannot return to her previous work, the
Commissioner bears the burden of establishing that the plaintiff retains the RFC to
perform alternative substantial gainful work in the national economy.  *Butts v.
Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  In the ordinary case, the ALJ carries out
this fifth step of the sequential disability analysis by applying the applicable Medical-
Vocational Guidelines ("the Grids").  *Id.*  The Grids divide work into sedentary, light,
medium, heavy, and very heavy categories, based on the extent of a claimant's ability to
sit, stand, walk, lift, carry, push, and pull.  20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla
v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996).  *See also* 20 C.F.R. §§ 404.1567
& 416.967.  Each exertional category of work has its own Grid, which then takes into
account the plaintiff's age, education, and previous work experience.  *Id.*  Based on
these factors, the Grids help the ALJ determine whether plaintiff can engage in any

other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[16] are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986).

"If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert[,]" rather than relying solely on the Grids. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (*citing Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)). The mere existence of a nonexertional impairment does not automatically require consultation with a vocational expert, nor does it preclude reliance on the Guidelines. *Bapp v. Bowen*, 802 F.2d at 603. The requirement for a vocational expert is triggered when a nonexertional impairment causes an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Id*. at 605-06. The appropriateness of applying the Grids and the necessity for expert testimony must be

---

[16] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c). Mental impairments are clearly nonexertional.

determined on a case-by-base basis. *Id*. at 605.

## B. Application

Plaintiff argues that the ALJ erred in determining that plaintiff could return to her previous work at Step Four, and in the alternative, that plaintiff could perform other work in the national economy at Step Five. Because this court has found that the ALJ's RFC determination that plaintiff could perform a full range of sedentary work is supported by substantial evidence, and plaintiff's medical secretary job was sedentary, the ALJ's Step Four determination was also supported by substantial evidence. In any event, even if the ALJ erred at Step Four, he proceeded to consider Step Five, and this determination is also supported by substantial evidence.

Plaintiff argues that the ALJ should have consulted a vocational expert "to determine how Plaintiff's occupational base would have been significantly eroded by [her] inability to fully meet the demands of sedentary work," including the limitations from her carpal tunnel impairment. (Pl.'s Br. at 24).

The ALJ considered Step Five in the alternative. (T. 19-20). The ALJ discussed the Grids, and found that plaintiff had the RFC for a full range of sedentary work, without any substantial non-exertional or exertional limitations. (T. 19). The ALJ then utilized the Grid to determine that plaintiff was not disabled, based upon her age, education and prior work experience. 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 201.21. Counsel is incorrect in his statement that the VE should have been consulted to determine whether plaintiff's work base was substantially eroded by her impairments. It is up to the ALJ to determine whether plaintiff has non-exertional or exertional

impairments that would significantly limit her ability to perform sedentary work. If he makes that determination then he may consult a VE. However, the ALJ correctly determined that plaintiff's impairments did ***not*** significantly limit her ability to perform sedentary work. Plaintiff's carpal tunnel and other impairments were considered in making the determination that plaintiff was limited to sedentary exertional capabilities. Thus, no further limitations were necessary, and the ALJ's alternative determination is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's determination be **AFFIRMED** and the plaintiff's complaint be **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: January 5, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**